# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

### NOVEMBER SESSION, 1998

FILED

March 10, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 03C01-9803-CR-00120** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **HAMILTON COUNTY** |
| **VS.** | ) | |
| | ) | **HON. GARY D. GERBITZ,** |
| **DELIVETRICK D. BLOCKER,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (Felony Murder, Especially |
| | ) | Aggravated Robbery) |

### ON APPEAL FROM THE JUDGMENT OF THE
### CRIMINAL COURT OF HAMILTON COUNTY

FOR THE APPELLANT:

PHILIP L. DUVAL
537 Market Street, Suite 204
Chattanooga, TN 37402

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

R. STEPHEN JOBE
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

BILL COX
District Attorney General

RODNEY STRONG
Assistant District Attorney General
Suite 300, Courts Building
Chattanooga, TN 37402

OPINION FILED _____

AFFIRMED IN PART; MODIFIED IN PART; REMANDED

DAVID H. WELLES, JUDGE

# OPINION

The Defendant, Delivetrick D. Blocker, appeals as of right his convictions and sentences for especially aggravated robbery and first degree murder committed during the perpetration of especially aggravated robbery. Following sentencing hearings, the jury sentenced Defendant to life imprisonment without the possibility of parole for his murder conviction; and the trial court sentenced him to twenty-two years for especially aggravated robbery, to be served consecutive to his life sentence. We affirm Defendant's conviction for felony murder and modify his conviction for especially aggravated robbery to attempted especially aggravated robbery.

In this appeal, Defendant presents seven issues for review: (1) whether the trial court erred by denying his motion to suppress his pretrial statement to police, (2) whether the trial court erred by allowing a witness to testify that the victim carried a wallet, (3) whether the trial court erred by failing to grant his motion for judgment of acquittal and whether the evidence was sufficient to sustain his convictions, (4) whether the trial court abused its discretion by ordering the sentence for especially aggravated robbery to be served consecutive to his sentence of life imprisonment without parole, (5) whether a juvenile may be sentenced to life without the possibility of parole, and (6) whether the trial court erred by permitting the jury to sentence him to life without the possibility of parole based upon the single aggravating factor of felony murder.

In this case, the proof at trial showed that Defendant and his severed co-defendants, cousin Robert Blocker and Calvin Trammell, who were all juveniles at the time of this crime,[1] called for a taxicab from a Hamilton County convenience store. When it arrived, they instructed the driver to take them approximately one-half mile, to a location that the State characterized as wooded and secluded, along a street with several vacant homes. As the perpetrators exited the car, Defendant heard Robert Blocker demand money from the driver, who reached over between the seats. Defendant told police that he believed the driver was reaching for a gun, so he pulled a sawed-off shotgun from his pants and pointed it at the driver. He then shot the driver at a range between six and twelve inches from his head. All three perpetrators fled the scene, and an area homeowner discovered the victim when the taxicab crashed into her patio.

## I. MOTION TO SUPPRESS

Defendant contends that the trial court erred by failing to suppress the statement he made to police on the night he was arrested. He argues (1) that officers did not advise him of his Miranda rights until after he made his statement, and (2) that waiver of his rights was not voluntary, knowing, and intelligent, but rather the product of coercion and intimidation. Both the juvenile court, prior to Defendant's transfer, and the Hamilton County Criminal Court held hearings on this matter, and both denied the motion to suppress. We affirm this decision, concluding that the evidence does not preponderate against finding that officers did not question Defendant prior to informing him of his Miranda rights and that his waiver was voluntary, knowing, and intelligent.

---

[1] Defendant was seventeen years old at the time of this crime.

*Juvenile Court Hearing*

At Defendant's suppression hearing in the Juvenile Court for Hamilton County, the judge heard testimony for the State from Detective Tim Carroll, who stated that he read Defendant his <u>Miranda</u> rights in the presence of Defendant's mother prior to any questioning about the murder. Carroll denied having any discussions regarding the outcome of the case, and he denied making any promises in exchange for a statement. Carroll also denied threatening Defendant to induce him to provide a statement. The detective testified that Defendant and his mother signed the waiver of rights form, and that Detective Tommy Woods and Ken McCrary, a juvenile officer, also witnessed Defendant's signature.

On cross-examination at the juvenile court hearing, Detective Carroll acknowledged that four or five other officers accompanied him to Defendant's home at the time of the arrest, that Defendant was taken separately from his mother to the police service center, and that Defendant did not have an opportunity to confer in private with his mother prior to his interview. Furthermore, the detective stated that he had a conversation with Defendant before he turned on the tape recorder to record the statement, but not before he read Defendant his <u>Miranda</u> rights.

Defendant's mother testified that on the day of his arrest, her son opened the door, saw the officers, and said he would get his mother. According to Ms. Blocker, officers followed Defendant back into the house and told Defendant that they were taking him in for questioning about a murder. They told Ms. Blocker, while in her son's presence, that she needed to come to the police service center because she "knew about" the crime and "could also be arrested."

When asked "at what point [Defendant] was read his Miranda rights in the interview room," Ms. Blocker replied, "After Tim Carroll told him if he bullshitted him, he'd make sure he'd get the g__d___ chair and my son said, okay, I'll tell you what you want to know." Ms. Blocker also testified, "In my presence the man just kept saying that he know [sic] what happened and that I knew what happened and if he kept—if he kept—if my son bullshitted him, he'd make sure he got the chair and he kept cursing my son." She stated that the Miranda rights waiver form "was read as the man was signing it, as the man was writing out the thing," and she affirmed that Defendant acknowledged on tape that he had signed the waiver. When asked on tape whether they had been threatened, neither Defendant nor his mother stated that threats had been made.

Defendant also testified at the juvenile suppression hearing. He stated,

When we came out of the house [on the night of arrest], Detective Tim Carroll pulled me away from a female officer and took me across the street and he said what do you know about the cab driver murder. I said I don't know nothing. He said before this night is over your g__d___ ass is going to know something and he took me back over there to her, to the female officer.

He affirmed that officers told his mother "she could be arrested for knowing something about the murder." Defendant stated that he signed the rights waiver "[a]fter Tim Carroll kept like making his little threats about the electric chair." He stated that no one read the form to him, that the threats scared him, and that he would not have made a statement to police had he not been threatened with the electric chair.

Defendant testified, "First, [Carroll] asked me, asked me my story. After he wrote all of that down, he told me—had me to sign it and he didn't read it off

to me or nothing, asked me to sign it." He claimed that his Miranda rights were read to him for the first time on the tape recording, after he had given his version of events and signed the waiver. He admitted that he had an opportunity to read the waiver before he signed it, but stated that he did not because he was "too busy" and "thinking about the threats [Carroll] made and thinking about [his] mama and [his] sisters." Finally, Defendant acknowledged that he stated on the tape recording that he understood his rights, waived his right to a lawyer, and waived his right to remain silent.

The juvenile court judge ruled in favor of the State, denying Defendant's motion to suppress. She stated that she did not find evidence of coercion and force so as to render the waiver of rights involuntary. Furthermore, she stated,

> I think there is a logical time frame laid out in this that supports the testimony of the officer and [is] also supportive of the testimony of these parents over here. . . . I don't find anything inconsistent with the State's testimony and I find nothing offered by the defendants on this through their witnesses to believe that these were anything other than voluntarily obtained by the officers in the course of this investigation that night.

*Criminal Court Hearing*

After Defendant was transferred to the Hamilton County Criminal Court to be tried as an adult, that court held another suppression hearing, in which the juvenile hearing transcript was entered into evidence. Detective Carroll and Defendant testified consistently with the prior hearing. Defendant's mother, Ms. Blocker, reiterated her previous testimony but added that Detective Carroll told her at least three times that "they were going to try to have [Defendant]

-6-

electrocuted." At the same time, she testified that Carroll told Defendant, "[I]f you tell me what I want to know, I'll go to the Judge and I'll talk to the Judge and tell him that you cooperated and I'll do . . . what I can for you." In addition, she testified that her son could read only at a third-grade level—not well enough to understand the Miranda waiver form—and that he had already told officers his story twice before ever being read those rights (during the tape recorded portion of the statement).

The trial court denied the motion to suppress, making several findings: (1) the defendants were properly arrested; (2) the requests made of the parents and guardians to be present were proper; (3) statements made to Ms. Blocker regarding her possible knowledge of the facts were not coercive in nature; (4) the procedure in the interview room and police service center hallways was extremely reasonable, timely, and not coercive; (5) no questioning took place prior to proper admonitions under Miranda; (6) the time sequence between the rights offerings and the actual taping of the statements was extremely reasonable; (7) the interviewing between individuals was reasonable and very understandable; and (8) the officers were not required to inform the parents of their function to advise their children during the interviewing process.

Our supreme court very recently discussed the manner of analysis for waiver of constitutional rights by juvenile criminal defendants. See State v. Callahan, 979 S.W.2d 577 (Tenn. 1998). In Callahan, the court held,

> [J]uvenile waivers shall be analyzed under a totality-of-the-circumstances test that requires consideration of the following factors:
> (1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;

> (2) the juvenile's capacity to understand the <u>Miranda</u> warnings and the consequences of the waiver;
> (3) the juvenile's familiarity with <u>Miranda</u> warnings or the ability to read and write in the language used to give the warnings;
> (4) any intoxication;
> (5) any mental disease, disorder, or retardation; and
> (6) the presence of a parent, guardian, or interested adult.

<u>Id.</u> at 583.

Regarding appellate review of a trial court's denial of motions to suppress evidence, our supreme court advised,

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise. . . . Hereafter, the proper standard to be applied in reviewing suppression issues is the "preponderance of the evidence" standard.

<u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996). From the above recitation of the facts, we find that the trial court properly considered the totality of the circumstances surrounding the interrogation when making the decision to deny Defendant's motion to suppress. Furthermore, we conclude that the evidence does not preponderate against the trial court's denial. Where the trial judge found conflicts among the statements by Detective Carroll, Defendant, and Ms. Blocker, he appeared to resolve them in favor of Detective Carroll, which was reasonable and not improper in his role as the trier of fact. This issue lacks merit.

## II. HABIT TESTIMONY

Defendant's second assignment of error involves the testimony at trial by the victim's niece, Terry Smith. Smith, a substitute witness who apparently provided substantially the same testimony as the anticipated witness, another member of the victim's family, responded to direct examination as follows:

Q. How well did you know your uncle?
A. Very well.
Q. Prior to October 8, 1995, how often would you see your uncle?
A. Everyday.
Q. Are you familiar with items that he may have carried on his person?
A. Yes, sir.
Q. Would he ever carry a wallet?
A. Yes, sir.
Q. Did you often see that wallet?
A. Yes, sir.
Q. What type of wallet was it?
A. It was a brown trifold.
Q. What did he have in that wallet?
A. He would carry pictures and large—his large bills he would keep in his wallet.

Smith also testified that, to her knowledge, members of her family had not received this wallet from the hospital, the police, or the Mercury Cab Company, the victim's employer. Upon cross-examination, Smith testified that she herself had not been the recipient of her uncle's personal items returned from the hospital, police, and cab company. In addition, she confirmed that some other items, such as a shoe and sock, were never recovered.

Defendant charges, in essence, that Smith's statements should have been excluded because the testimony is so speculative that it lacks relevance to the issue of whether the victim carried the wallet on the day of his death. The issue

is significant because no other evidence of theft exists in the record to support a conviction for especially aggravated robbery.[2]

The State responds by arguing that Smith's testimony was admissible as evidence that the victim had a habit of carrying a wallet, introduced for the purpose of inferring conduct in conformity therewith on the day at issue—in other words, that because the victim had been seen carrying a wallet in the past, and because no wallet had been returned to the victim's family, Defendant or one of his co-perpetrators must have taken the wallet.

Tennessee Rule of Evidence 406 states:

(a) Evidence of the habit of a person, an animal, or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eye-witnesses, is relevant to prove that the conduct of the person, animal, or organization on a particular occasion was in conformity with the habit or routine practice.
(b) A habit is a regular response to a repeated specific situation. A routine practice is a regular course of conduct of an organization.

Habit evidence must be distinguished from character evidence governed by Tennessee Rule of Evidence 404. Whereas under Rule 404(b), evidence of prior acts may not be introduced "to prove the character of a person in order to show action in conformity with the character trait," there is no such limitation on evidence _not_ introduced to prove a trait of character. One commentator has remarked, "Since Rule 406 admits evidence that would probably be admitted anyway under the general relevance principles embraced in Rule 401, it is

---

[2] See supra Part III.

arguable that Rule 406 adds little new to modern evidence law." Neil P. Cohen et al., Tennessee Law of Evidence 200 (3d ed. 1995).

We agree with Defendant that the State did not demonstrate through witness Terry Smith that the victim habitually carried a wallet, as a regular response to a repeated specific situation. However, because the tendency to carry a wallet daily cannot be construed as proof of the "character of a person in order to show action in conformity with a character trait," there are no limitations placed by Rule 404(b) on the admissibility of the evidence. Therefore, so long as the testimony was "relevant" within the meaning of Rule 401,[3] it need not rise to the level of habit evidence under Rule 406—to be evidence of habit would only supplement its admissibility.

> According to Tennessee Rule of Evidence 103,
>
> [e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context.[4]

Tenn. R. Evid. 103(a)(1). Furthermore, the general "standard of review where the decision of the trial judge is based on the relevance of the proffered evidence under Rules 401 and 402 is abuse of discretion." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. West, 737 S.W.2d 790, 793-94 (Tenn. Crim. App.

---

[3] "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." Tenn. R. Evid. 401.

[4] This matter was addressed by counsel for Defendant in a jury-out hearing prior to the witness's testimony.

1987) (citing Strickland v. City of Lawrenceburg, 611 S.W.2d 832, 835 (Tenn. Ct. App. 1980)).

In this case, we find both (1) that no substantial right has been affected within the meaning of Rule 103, and (2) that the trial court did not abuse discretion by admitting the testimony of Terry Smith. This issue lacks merit.

### III. MOTION FOR ACQUITTAL/SUFFICIENCY OF EVIDENCE

At the conclusion of the State's proof, Defendant moved for judgment of acquittal on the basis of the sufficiency of the proof, and his motion was denied. He argues now before this Court that the evidence was insufficient to sustain his convictions. We conclude that the evidence was insufficient to support his conviction for especially aggravated robbery and that this conviction should be modified to attempted especially aggravated robbery. However, despite this lack of evidence, Defendant's felony murder conviction is well supported by proof that he committed an attempted especially aggravated robbery. We therefore affirm his conviction for first degree felony murder.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact beyond a reasonable doubt." Tenn. R. App. P. 13(e). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v.

<u>Grace</u>, 493 S.W.2d 474, 476 (Tenn. 1976), and <u>State v. Brown</u>, 551 S.W.2d 329, 331 (Tenn. 1977)); <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982); <u>Holt v. State</u>, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." <u>Tuggle</u>, 639 S.W.2d at 914 (citing <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. <u>Evans</u>, 838 S.W.2d at 191 (citing <u>Cabbage</u>, 571 S.W.2d at 836). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. <u>Tuggle</u>, 639 S.W.2d at 914.

The offense of especially aggravated robbery is "robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon . . . [and w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403. Tennessee Code Annotated § 39-13-401 defines robbery as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." <u>Id.</u> § 39-13-401. Finally, "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." <u>Id.</u> § 39-14-103.

As noted above in Part II, the only evidence in the record tending to show that the victim carried a wallet at the time of his death consisted of Terry Smith's one-word affirmations in response to "Would he ever carry a wallet?" and "Did you often see that wallet?" In addition, the only proof that the victim carried

money on the night of his death was Smith's statement that he sometimes carried large bills in his wallet.[5] No other proof of a theft of property is contained in this record.

We find Smith's testimony, and the statements by Smith and an investigative officer that no wallet was recovered during the investigation, to be insufficient to permit the jury to find a theft had occurred. To hold otherwise, this Court would have to determine that the jury properly inferred one of two scenarios. First, because the victim drove a taxicab, he must have possessed more money at the time of his death than was returned to his family, and this money must have been taken by the perpetrators. Second, because the victim's niece had often seen him carry a wallet, he must have carried one that night (even though Smith never stated how often she had seen the wallet, nor did she testify to a time frame prior to the murder during which she saw it); and because no wallet was recovered, the perpetrators must have taken the wallet. We reject both scenarios as impermissible leaps of faith for the jury. Therefore, we must modify Defendant's conviction for especially aggravated robbery to one for attempted especially aggravated robbery.

Conviction by a jury for the greater offense necessarily includes a finding of guilt on each element of a lesser included offense. Even though we modify Defendant's conviction for especially aggravated robbery to attempted especially aggravated robbery, we nevertheless uphold his conviction for first degree felony murder by finding that the evidence was more than sufficient to find that the

_____

[5] Although the State introduced proof that the victim had been paid approximately two dollars for his last fare before his death, the record reflects that the hospital returned "small bills" to the deceased's family.

murder was committed during the perpetration of attempted especially aggravated robbery.

For the indicted count of felony murder, the jury was charged in part as follows:

> For you to find the defendant guilty of murder in the first degree under this count of the indictment, the State must have proven beyond a reasonable doubt the following:
> 1. The defendant unlawfully killed the victim;
> 2. The defendant acted recklessly;[6]
> 3. The killing was committed in the perpetration of or the attempted [sic] to perpetrate the allegedly especially aggravated robbery. That is that the killing was closely connected to the alleged especially aggravated robbery and was not a separate, distinct and independent event;
> And
> 4. That the defendant intended to commit the alleged especially aggravated robbery.

Furthermore, Tennessee Code Annotated § 39-12-101 states:

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(3).

Defendant's own statement to police contains sufficient evidence to convict him of felony murder based upon attempted especially aggravated robbery. The group of men, who had been out walking throughout the evening, called a taxicab and requested to be taken a distance of approximately one-half mile. As Defendant told police, "I get [sic] out of the car to go and knock on the door cause

---

[6] Although this jury instruction was erroneous—a reckless mental state was no longer required for the offense of felony murder at the time this crime occurred—we find that such error was harmless because it heightened rather than lowered the level of proof necessary for the jury to convict Defendant. Furthermore, the error was not preserved for review.

-15-

I was going over to a friend [sic] house and by that time I heard Calvin, I turned around and heard Calvin asking the cab driver for money, say did he have any money." Then, "Cab driver started digging in the side of his seat then I ran over there, put the gun to his head." Defendant's statement later reflects this exchange:

Carroll:     And what did you tell him.
D. Blocker:  Told him to start reaching.
Carroll:     Get his hands up.
D. Blocker:  No. Just . . He was reaching through his head and I say start reaching between, you know what I'm saying, I was saying just start reaching.

Defendant then admitted that he shot the victim and ran from the scene. We conclude that the evidence was sufficient to permit the jury to find Defendant guilty of first degree murder committed during the attempt to perpetrate an especially aggravated robbery.

Because the jury convicted Defendant of killing the victim during an especially aggravated robbery (though not supported by the proof), we believe its verdict clearly incorporated all the elements of a killing during an attempted especially aggravated robbery, which the proof supports.

## IV. MODIFICATION OF SENTENCE

Following Defendant's sentencing for first degree felony murder, the trial court held a sentencing hearing for Defendant's conviction for especially aggravated robbery and sentenced him to twenty-two years as a Range I offender, to be served consecutive to his sentence of life imprisonment without the possibility of parole.

When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

When conducting a de novo review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987); Tenn. Code Ann. §§ 40-35-102, -103, -210. We use the same criteria to determine the appropriate modification of Defendant's sentence in conjunction with our modification of his conviction from especially aggravated robbery to attempted especially aggravated robbery.

In this case, the trial court found that the range for especially aggravated robbery was fifteen to twenty-five years, and that sentencing considerations for this offense should begin at the mid-point of the range, twenty years. See Tenn. Code Ann. § 40-35-210(c). In addition, the trial judge first found that enhancement factor one—that "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the

appropriate range"—was applicable. See Tenn. Code Ann. § 40-35-114(1). Although he did not consider Defendant's prior crimes to be "major offenses," he found that the crimes were concentrated in a very short period of time—between the ages of fourteen and eighteen. He therefore increased Defendant's sentence from the twenty-year mid-point to twenty-two years.

Next, the trial judge rejected enhancement factors two and eight—that "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors" and that "[t]he defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community," respectively. See id. § 40-35-114(2), (8). The judge noted that he did not find "any significant basis" to support a determination that Defendant was the leader in commission of the robbery, despite the fact that Defendant shot the victim. Furthermore, he declined to find any significant history of unwillingness to comply with conditions of release because Defendant committed the offense as a juvenile, and all previous criminal convictions were from the juvenile court.

The trial judge then considered and rejected the three mitigating factors presented by Defendant. First, the judge found mitigating factor two—that "[t]he defendant acted under strong provocation"—inapplicable because this case did not "involve a theft case where an individual is stealing food for his family," and because he found no other proof of provocation in the record. See id. § 40-35-113(2). Next, he rejected mitigating factor eight, that "[t]he defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense." In support, the trial judge noted that he found nothing in the expert testimony presented to indicate a disability within the

meaning of this mitigating factor. Finally, although he noted that Defendant was seventeen years old at the time of the offense, he also found that the Defendant was "streetwise," and therefore "considerably older" than seventeen. Thus, he rejected mitigating factor six, which states, "The defendant, because of youth or old age, lacked substantial judgment in committing the offense." See id. 40-35-113(6).

The range for a standard offender convicted of attempted especially aggravated robbery, a Class B felony, is between eight and twelve years. See Tenn. Code Ann. §§ 39-12-107; 39-13-403. According to sentencing guidelines, consideration should begin at the minimum for the range. See id. § 40-35-210(c), (d). We therefore enhance Defendant's sentence in accordance with the findings of the trial court, and we sentence Defendant to nine years as a standard range I offender for attempted especially aggravated robbery.

## V. CONSECUTIVE SENTENCING

After concluding that Defendant was a dangerous offender due to the number and increasing severity of his prior convictions, the type of offenses in the convictions at bar, the lack of indication that rehabilitation would be successful, and the need for the public to be protected from these type of offenses; the trial judge approved consecutive sentencing, with Defendant's twenty-two year sentence to be served consecutive to his sentence of life without the possibility of parole. See id. § 40-35-115(a)(4).

Defendant contends in this appeal that consecutive sentencing is improper because the proof does not support the trial court's finding that he is a dangerous

offender. We conclude that the trial court fulfilled its role in the sentencing process such that its findings concerning consecutive sentencing should be reviewed de novo with a presumption of correctness. After conducting this review, we conclude that the trial court did not err by finding Defendant to be a dangerous offender and ordering his sentences served consecutively.

Tennessee Code Annotated § 40-35-115 provides that if the trial court finds a defendant to be "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high," it may order multiple sentences served consecutively. Id. § 40-35-115(a)(4). Our supreme court has explained, "'Lack of hesitation' is semantically close to 'reckless indifference' and signifies a conscious lack of concern for foreseeable consequences." State v. Wilkerson, 905 S.W.2d 933, 937 (Tenn. 1995). In addition, "[t]he proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." Id. at 938. Finally, the trial court must consider the general sentencing principles contained in Tennessee Code Annotated §§ 40-35-102(1), 40-35-103(1), and 40-35-103(2). Id.

The transcript of Defendant's sentencing hearing reflects that the trial court considered these general sentencing principles as well as the other factors enumerated above. Furthermore, we have reviewed the record and conclude that it supports the trial court's decision. With regard to the factor of protecting society from further criminal acts by the offender, it has been posited that there can be no necessity to further protect society from an offender sentenced to life

imprisonment without parole, and that consecutive sentencing would therefore never satisfy this criteria in such a case. While this argument certainly bears logic,[7] we note that our supreme court has declined to give the claim merit, denying permission to appeal in several cases in which an additional sentence has been ordered served consecutive to a sentence of life imprisonment without parole. See, e.g., State v. Robinson, 930 S.W.2d 78, 75 (Tenn. Crim. App. 1995), perm. to appeal denied (Tenn. 1996); State v. Leon Barnett Collier, No. 03C01-9602-CR-00072, 1997 WL 9722 (Tenn. Crim. App., Knoxville, Jan. 13, 1997), perm. to appeal denied (Tenn. 1997); State v. Sammie Lee Taylor, No. 02C01-9501-CR-00029, 1996 WL 580997 (Tenn. Crim. App., Jackson, Oct. 10, 1996), perm. to appeal denied (Tenn. 1997). Furthermore, the supreme court has upheld running a sentence consecutive to a sentence of death. State v. Black, 815 S.W.2d 166, 191 (Tenn. 1991). Rather than attempting further analysis, we defer to the guidance of our supreme court and to the discretion of the trial judge and order the modified sentence of nine years for attempted especially aggravated robbery to be served consecutive to Defendant's sentence for felony murder.

## VI. LIFE WITHOUT PAROLE FOR JUVENILES

Defendant next contends that the trial court erred by permitting the jury to sentence him to life imprisonment without parole when he committed these crimes as a juvenile. He argues that our legislature has prohibited sentencing a juvenile to death in order to grant juveniles another chance at life, see Tenn. Code Ann. § 37-1-134(a)(1); and he asserts that the same rationale should apply

---

[7] The legislature has provided that a person sentenced to life without parole shall never be eligible to be released on parole. Tenn. Code Ann. § 40-35-501(h)(2).

to a sentence of life without parole. Furthermore, he suggests that while the statute authorizing the penalty of life without parole does not specifically exclude juvenile defendants, neither does the statute declare them eligible.

Tennessee Code Annotated § 37-1-134 provides in part, "The district attorney general may not seek, nor may any child transferred under the provisions of this section [from the juvenile court] receive, a sentence of death for the offense for which the child was transferred." Id. § 37-1-134(a)(1). We find that the more appropriate rule of statutory construction would be to assume the legislature would have also prohibited the penalty of life without parole in the same code section, had it so intended. Therefore, we decline to depart from our decision in State v. Antonio M. Byrd, No. 02C01-9508-CR-00232, 1997 WL 1235, at *20 (Tenn. Crim. App., Jackson, Dec. 30, 1996), perm. to appeal denied (Tenn. 1997), in which this Court observed,

> The legislature has made a specific exception for the death penalty. If a specific exception were also intended for the penalty of life without the possibility of parole, the legislature would have made an exception for that as well. Moreover, the statutes providing for the sentence of life without the possibility of parole provide no exception for juveniles.

Id. This issue lacks merit.

## VII. FELONY MURDER AGGRAVATING FACTOR

Finally, Defendant contends that the trial court erred by permitting the jury to sentence him to life imprisonment without the possibility of parole based upon the single aggravating factor of felony murder. See Tenn. Code Ann. § 39-13-204(i)(7) ("The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or

attempting to commit , or was fleeing after having a substantial role in committing or attempting to commit, any . . . robbery . . . ."). This issue was squarely resolved by our supreme court in State v. Butler, 980 S.W.2d 359 (Tenn. 1998), in which the court stated, "The felony murder aggravator (i)(7) can be used to enhance a sentence to life without the possibility of parole when the defendant is convicted of felony murder." Therefore, this issue is without merit.

## VIII. CONCLUSION

Because we conclude that the evidence was insufficient to permit the jury to conclude Defendant committed an especially aggravated robbery, we modify this conviction and remand to the trial court for an entry of conviction for attempted especially aggravated robbery. Having found no other error, we affirm Defendant's conviction for first degree murder in perpetration of attempted especially aggravated robbery.

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
JAMES CURWOOD WITT, JR., JUDGE

_____
L.T. LAFFERTY, SENIOR JUDGE